# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**LOREN BENNINK,**

      **Plaintiff,**

         **v.**

**CINCINNATI BELL TELEPHONE COMPANY, LLC,**

      **Defendant.**

**Case No. 1:23-cv-774**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Plaintiff Loren Bennink worked for Defendant Cincinnati Bell Telephone Company, LLC (Cincinnati Bell) as an operations/IT solutions and services engineer. Throughout his employment, he often worked well over forty hours per week. But according to Bennink, Cincinnati Bell did not pay him for that overtime work. So he sued Cincinnati Bell for withholding of overtime compensation under the Fair Labor Standards Act (FLSA), untimely payment of wages under Ohio statutory law, and breach of contract under Ohio common law. The parties now cross-move for summary judgment. Because no employment contract existed between Bennink and Cincinnati Bell, and because Bennink is subject to the FLSA's computer employee exemption, the Court **GRANTS** Cincinnati Bell's Motion for Summary Judgment (Doc. 19), and correspondingly **DENIES** Bennink's Motion for Summary Judgment (Doc. 20).

# BACKGROUND[1]

This dispute, as is so often the case, is about money. More specifically, it's about Cincinnati Bell's failure to pay Bennink overtime compensation that he alleges it owed. Not surprisingly, then, much of this lawsuit centers on Bennink's employment relationship with Cincinnati Bell. But that relationship has evolved over the years.

Bennink's professional relationship with Cincinnati Bell began in 2009 while Bennink was working as an independent contractor for Startek—a third-party company to which Cincinnati Bell had outsourced its contact center operations. (Doc. 12, #89; Doc. 19-2, #1775; Doc. 23-1, #1958). As a self-employed Startek contractor, Bennink was the "point" information technology (IT) project manager for the work Startek did for Cincinnati Bell. (Doc. 12, #97). In particular, Bennink led Startek's development of Cincinnati Bell's interactive voice response (IVR) technology—the automated, interactive technology through which customers can use voice commands or make menu selections to navigate to the desired customer support function. (*Id.* at #190, 197–98).

In May 2016, however, Bennink's relationship with Cincinnati Bell changed. At that point, Cincinnati Bell hired Bennink as a W-2 employee to support a transition of Cincinnati Bell's contact center operations from Startek to in-house. (Doc. 22-1, #1881). But Bennink's role at Cincinnati Bell wasn't clearly defined. (*See* Doc. 12, #297). For example, he claims he never received an official job title, though

---

[1] Pursuant to the Court's Civil Standing Order (I)(F)(2)(a)–(c), Cincinnati Bell and Bennink simultaneously filed a list of Proposed Undisputed Facts (Docs. 19-2, 20-1) with their motions. Each party admitted to many of the other's proposed facts. (Docs. 22-1, 23-1). Unless otherwise noted, the Court cites those documents only for admitted facts.

he considered himself an Operations/IT Solutions and Services Engineer. (*Id.* at #189; Doc. 12-7, #598).

The parties largely agree about the facts recited so far. But they disagree about most other aspects of this case. And that disagreement stems, in large part, from the apparent confusion related to Bennink's employment status. In particular, as the Court discusses more fully below, the parties have conflicting views about (1) whether Bennink was an hourly employee or a salaried one, and (2) whether his job duties at Cincinnati Bell qualified him as a computer employee, a category of employee that the FLSA exempts from overtime pay requirements. So in relaying the rest of the relevant background, the Court will first focus on facts related to Bennink's employment status and pay structure, and will then turn to facts concerning Bennink's job responsibilities.

Start with Bennink's employee status and pay. When Cincinnati Bell hired Bennink in May 2016, it provided him an offer letter that said a few notable things. First, that Bennink would assume the role of "CBTS Contingency 3 – IT"; second, that Bennink would be compensated either "at a rate of $70.06 per hour" if he elected to receive medical coverage or at "a rate of $75.00 per hour" if he declined medical coverage; third, that the "offer letter d[id] not constitute an employment contract." (Doc. 12-2, #507). Notably, Cincinnati Bell's internal classifications describe "Contingency 3" employees as those who "function in the computer field as a skilled worker," and the company tags those employees as "[e]xempt" under the FLSA. (Doc. 17-8, #1609). Bennink ultimately accepted the employment offer but declined medical

3

insurance. (Doc. 22-1, #1882). In short, then, he was a "Contingency 3 – IT" employee with a pay rate of $75 per hour.

Beyond the offer letter, a few other human resources (HR) forms affected Bennink's employment. First was the "New Hire/Rehired Employee/Job Bank Pre-Employment Form," which HR also called the "GE16 form." (Doc. 13-1, #785–89; Doc. 14-2, #994). That form listed Bennink as a "Contingency Employee – Hourly." (Doc. 14-2, #994). But according to Katie Ashworth—the HR employee who completed the form—that did not mean she was identifying him as an employee compensated on an hourly (as opposed to salaried) basis. Rather, she identified Bennink that way because it was the only "dropdown option" available when she completed the form. (Doc. 13-1, #786). In other words, there was no dropdown option for "Contingency Employee – Salaried." (*Id*.). Ashworth also testified that this GE16 form was used only as a "notification system" (to create employee identification cards, for example) and did not impact an employee's pay structure. (*Id*. at #785–86).

The second relevant HR form was the PACCE Change Form, which Cincinnati Bell acknowledges is a payroll-related document. (*See* Doc. 22, #1868). During Bennink's tenure, Cincinnati Bell completed two PACCE forms on his behalf. The first, finalized on May 20, 2016, identified Bennink as "FLSA Class: Computer" and "Empl[oyee] Type: H." (Doc. 13-1, #787; Doc. 14-2, #996). That "H" stands for "Hourly." (Doc. 22-1, #1882). But simultaneously, in the section titled "Salary," the PACEE form listed Bennink's "Comp[ensation] Rate" as "$3,000." (Doc. 14-2, #996). When questioned about that inconsistency, Ashworth explained that any

"contingency" employee was marked on the PACCE form as an hourly employee, but if that employee was marked as FLSA exempt, then he or she would nonetheless be paid a salary. (Doc. 13-1, #789–94). So that's the first PACCE form. Cincinnati Bell completed a second PACCE form for Bennink on July 15, 2016. (Doc. 14-2, #997). That one merely documented his switch from full-time to part-time employment. (*Id.*).

That leaves the last category of notable documents: Bennink's pay stubs. (Doc. 13-1, #790–94). On those, Cincinnati Bell classified him as "Flexible Resource – Exempt." (*See generally* Doc. 19-1). And the pay stubs listed Bennink's pay rate as "$3,000.00 Weekly." (*Id.*).

Beyond those documents, there's one other pay-related detail worth noting: hour reporting. Cincinnati Bell required all of its employees to enter their hours into the company's MyHR reporting system every two weeks, whether the employee was hourly or salaried. (Doc. 19-2, #1780; Doc. 23-1, #1962). Exempt employees, however, could not input more than forty hours of work per week, regardless of the hours they worked. (Doc. 19-2, #1780; Doc. 23-1, #1962). Bennink was among the employees for whom Cincinnati Bell restricted hour entries to forty hours per week. (Doc. 19-2, #1780; Doc. 23-1, #1963).

So how did all that play out in terms of Bennink's actual pay? Well, for five non-contiguous pay periods between June and September 2016, Cincinnati Bell paid Bennink less than $6,000 (that is, less than $3,000 weekly). (Doc. 16-2, #1192–94, 1199–1200). But for the remaining six-and-a-half years after that, Cincinnati Bell paid Bennink $6,000 each pay period. (*Id.* at #1192–1198, 1201–1310). Bennink says

the five less-than-$6,000 payments demonstrate that he was an hourly employee since those were the weeks he reported working less than forty hours. (Doc. 20, #1806). In other words, he contends that his pay fluctuated depending on the hours he worked if those hours fell below forty. Cincinnati Bell, for its part, chalks the five non-$6,000 pay periods to "administrative error," which the company corrected by September 2016. (Doc. 22, #1871–73). Cincinnati Bell adds that it always intended for Bennink to be a salaried employee, as shown by the over-six-years of 80 reported-hour/$6,000 paychecks. (*Id.*). With all of these various ambiguities, that's what the record has to say about Bennink's employment status and pay.

Turn now to the substance of Bennink's role and responsibilities at Cincinnati Bell. Generally speaking, Bennink acted as a sort of "project manager" for undertakings involving Cincinnati Bell's call center operations. (Doc. 19-2, #1781; Doc. 23-1, #1964). In that capacity, he (among other things) designed, implemented, and maintained IT solutions and services; executed "highly complex projects"; created budgets; established relationships with clients, stakeholders, and IT teams; managed contracts; helped troubleshoot infrastructure issues; and accomplished contact center infrastructure migrations. (Doc. 12-7, #598). Using Bennink's own words, his resume describes some of his "core competencies" as "strategic planning [and] analysis, project management, services engineering, telephony designs [and] development, technical writing, infrastructure maintenance, and contract management," among others. (Doc. 12-7, #598 (capitalization omitted)).

In connection with IT solutions, Bennink designed things like Cincinnati Bell's IVR call flow and dial plans. (Doc. 12, #222). The IVR call flow, as noted earlier, is the automated "telephony interface" with which a caller interacts to help direct his or her call. (*Id.* at #197–98). It's where a caller can, for example, press one for account information, two for sales, three for support, etc. (*See id.*). A dial plan, in turn, helps route a customer's call to an agent with the correct "skills" or expertise, depending on the customer's indicated needs. (*Id.* at #225). Also relevant are switches, which Bennink didn't design, but which he had to understand when fashioning the IVR system and dial plans. (*See id.* at #227–28). A switch is "the primary hitting point of a call." (*Id.* at #227). After the IVR system delivers a call to the switch, the switch transfers the call, based on the dial plan, to an agent with the right "skill," thus connecting customers with an agent who can attend to their needs. (*See id.* at #227–28).

Bennink was charged with designing and maintaining Cincinnati Bell's IVR system, and he used Microsoft's Visio software (a flowcharting program) to document that design. (*Id.* at #190–91). To craft the system, Bennink would consider an end user's (i.e., a customer's) expectations, map out an operational call flow design, and then collaborate with the IT team to ensure his operational plan would work "from a technical perspective." (*Id.* at #192–95). To accomplish that, Bennink admits he had to understand not only the IVR system, but the "full infrastructure"—that is, the databases and applications from which data was pulled. (*Id.* at #193). When developing the IVR design, Bennink focused on "data points" and how data "flow[ed]"

through the IVR system; what data the IVR system "consume[d]"; and how the IVR system "interact[ed]" with that data. (*Id.* at #198). After Bennink mapped his design in Visio, he would pass it along to IT who would "write a technical spec document" and develop code to implement the design. (*Id.* at #195). In a word, the IVR system was "complex." (*Id.* at #198). For example, a printed Visio diagram memorializing Bennink's IVR system design spanned about fifteen feet. (*Id.* at #197–98).

But Bennink's role with respect to the IVR system wasn't limited solely to design; he also helped troubleshoot IVR-related issues. (*Id.* at #232–33). Although IT monitored the IVR infrastructure, issues often "came through the operations channel" and landed on Bennink's lap. (*Id.* at #232). And since he knew the whole infrastructure, he helped identify issues, troubleshoot problems, and would refer any application-access or service issues to IT. (*Id.* at #232–33).

Beyond designing and troubleshooting the IVR system, Bennink had other tasks, too. One was managing infrastructure migrations—moving IT resources from one environment to another. (*See id.* at #234–35; Doc. 12-7, #598). So, for example, when Cincinnati Bell transitioned its IT infrastructure from Startek to in-house, Bennink oversaw that. (Doc. 12, #106). And then when Cincinnati Bell contracted with Avaya—an IT services provider—to transition its IT platform from "on-premise" to "cloud-based," Bennink again acted as the "point" person. (*Id.* at #220–21, 232–35). He finalized the contract with Avaya, quarterbacked the transition, and then managed Cincinnati Bell's relationship with Avaya. (*Id.*; *see* Doc. 19-2, #1788; Doc.

23-1, #1969). Bennink also handled the "Hawaii Telecom migration" when Cincinnati Bell acquired that company in 2021. (Doc. 12, #235–36).

In short, Bennink's work at Cincinnati Bell involved "creative … solutioning," collaboration, and minimal supervision. (*Id.* at #184–88, 194, 206, 241; *see* Doc. 19-2, #1782; Doc. 23-1, #1964–65). That said, there were some limitations on his day-to-day tasks. These were illustrated, for example, on Cincinnati Bell's "RACI" (responsible, accountable, consulted, informed) chart. (Doc. 14-2, #1098–1100). That chart explained several individuals' levels of involvement in various contact center infrastructure activities. (*Id.*). "Responsible" indicated higher-level engagement, and "informed" indicated lower-level engagement on an activity. (*See id.*). Of the forty-six activities listed, Bennink was "responsible" (i.e., the highest level of engagement) for twenty-six. (*Id.*). These included understanding "how users are using the applications, how they are supposed to be using the applications and how things should be working"; defining business requirements; designing call flow requirements; conducting call routing user acceptance testing; presenting change requests; and managing certain contracts. (*Id.*). As to the remaining twenty activities, Bennink had a lesser responsibility. For example, Bennink was either "consulted" or merely "informed" about coordinating the response to platform issues and outages, coordinating patches and other maintenance operations on the call center infrastructure, and certain other network-related activities. (*Id.*). And it appears he had no role in system integration testing. (*Id.* at #1099). In a January 2023 meeting,

Bennink's supervisor reinforced the RACI chart's division of duties, explaining that Bennink should "[s]tick to it, no deviations." (*Id.* at #1103).

Although Bennink, for the most part, enjoyed working at Cincinnati Bell, as his time there progressed, the work piled on. (Doc. 12, #363). As just noted, in 2021, Cincinnati Bell acquired Hawaiian Telecom. (Doc. 22-1, #1888). That meant Hawaiian Telecom's contact center operations had to integrate into Cincinnati Bell's. And Bennink had "primary responsibility" for that migration—in addition to his already-existing duties. (*Id.*; Doc. 19-2, #1785; Doc. 23-1, #1967). With the Hawaiian Telecom migration added into the mix, Bennink's hours became unmanageable. He says that he often worked between fifteen and eighteen hours per day in his last two to three years of employment with Cincinnati Bell. (Doc. 12, #269). In an effort to tame his unruly hours, Bennink raised concerns about his workload to various supervisors. (*Id.* at #166–75; *see* Doc. 19-2, #1789; Doc. 23-1, #1970). But according to him, it was all to no avail. In Bennink's telling, one supervisor told him to simply say "no" to additional work. (Doc. 12, #172). Exhausted, Bennink eventually left Cincinnati Bell in June 2023. (*Id.* at #284). All told, he calculates that Cincinnati Bell failed to pay him for 1,234 overtime hours between 2021 and 2023. (*See generally* Doc. 12-12).

Frustrated by Cincinnati Bell's failure to address what he saw as an untenable situation, Bennink filed this three-count lawsuit on November 21, 2023. (Doc. 1). He asserts unlawful withholding of overtime compensation under the FLSA (Count 1); untimely payment of wages under Ohio Revised Code § 4113.15 (based on the same

alleged overtime) (Count 2); and breach of contract (again based on his uncompensated work hours) (Count 3). (*Id.* at #4–6).

Both parties now move for summary judgment. Cincinnati Bell argues that Bennink's breach of contract claim fails as a matter of law since his offer letter stated that it was not an employment contract, and no other contract existed between the parties. (Doc. 19, #1690–92). And it says Bennink's wage-related claims fail because he was exempt from FLSA overtime laws under the computer employee, administrative employee, and highly compensated employee exemptions. (*Id.* at #1692–1705). Bennink, unsurprisingly, disagrees on all fronts. He did not move for judgment on the breach of contract claim. But he asserts that the parties' at-will employment relationship is "contractual in nature," and that a reasonable jury could find Cincinnati Bell liable for breaching a contractual obligation based on that relationship. (Doc. 23, #1935–38). As for Bennink's wage-related claims (for which he does seek summary judgment), he says that none of the three FLSA exemptions apply to him. (*Id.* at #1939–57). And as those exemptions are Cincinnati Bell's only defense to liability, that in turn, he says, means he's entitled to judgment on those claims. (Doc. 20, #1796–97).

Each party responded to the other's motion, (Docs. 22, 23), and then replied, (Docs. 24, 25). The Court also heard oral argument on the motions. (8/27/25 Min. Entry). So the motions are now ripe for review.

## LEGAL STANDARD

In evaluating the parties' cross-motions for summary judgment, the Court keeps in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.,* No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But the non-moving party cannot defeat a motion for summary judgment merely by pointing to any factual dispute. As the Sixth Circuit has explained, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (cleaned up) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

When both parties move for summary judgment, that does not change the analysis the Court applies to each party's motion. Rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Black v. Pension Benefit Guar. Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quotation marks omitted)), *superseded on other grounds*, 983 F.3d 858 (6th Cir. 2020). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## LAW AND ANALYSIS

Bennink asserts two categories of claims against Cincinnati Bell: a breach of contract claim and wage-related claims. The Court takes each category in turn. As for the latter, because Bennink's claim for untimely wages under Ohio Revised Code § 4113.15 rises and falls with his FLSA overtime compensation claim, the Court analyzes them together. *Heard v. Nielson*, No. 1:16-cv-1002, 2017 WL 2426683, at *2 (S.D. Ohio June 2, 2017). In the end, each of Bennink's claims fails as a matter of law on the record here.

A.    **Bennink's Breach of Contract Claim Fails Because No Employment Contract Existed Between Bennink and Cincinnati Bell.**

Cincinnati Bell moves for judgment on Bennink's breach of contract claim, arguing that no contract existed, which means no breach could have occurred. (Doc. 19, #1690). The Court agrees. For one, Bennink's offer letter—which he attached to his Complaint to support his breach of contract claim—states that it "does not constitute an employment contract." (Doc. 1-2, #9). For another, Bennink admits that it's not a contract, or at the very least, that there wasn't a "meeting of the minds," (Doc. 12, #147–48), which is an "essential element of a valid contract." *Fry v. FCA US LLC*, 143 N.E.3d 1108, 1114 (Ohio Ct. App. 2017). Given those undisputed facts, Bennink's breach of contract claim fails as a matter of law.

Bennink, in an attempt to work around the offer letter and his admission, insists that all at-will employment relationships create implied employment contracts. (Doc. 23, #1935 (citing *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 32 (Ohio 2004))). And since Cincinnati Bell did not pay him $75 per hour—which he characterizes as the parties' "agreed-upon rate"—he says the company breached its contractual obligation. (*Id.* at #1938). The Court, however, can make short work of that argument. While Bennink is right that "[a]t-will employment is contractual in nature," *Columber*, 804 N.E.2d at 32, it doesn't follow that all at-will employment relationships necessarily create an implied contract that is binding on the parties and enforceable through a breach of contract action. Any such conclusion vastly overreads *Columber*, which involved an express non-compete contract. *Id.* at 29. Here, by contrast, there's no express contract to speak of. And the Court is aware

of no Ohio law suggesting that at-will employees, as a general matter, can sue in contract. *See, e.g.*, *Kirksey v. Auto. Cosms. Corp.*, 2004-Ohio-1060, ¶ 13 (10th Dist.).

True, Ohio law recognizes that things like employee handbooks or policy manuals can sometimes "alter the initial at-will nature of [an] employment" relationship. *Clayton v. Cleveland Clinic Found.*, 2015-Ohio-1547, ¶ 11 (8th Dist.). But to do so "both parties must have intended" that result. *Id.* In other words, there must be a meeting of the minds. *Id.* ¶ 15. But here, as noted, Bennink admits that, when it came to the offer letter—which is the document on which Bennink relies as the starting point for his contract claim—there was no meeting of the minds as to any contract. (Doc. 12, #147–48). So his attempt to invoke the implied contract exception to the employment at-will doctrine (if that is in fact what he's asserting) fails, as "nothing altered [Bennink's] at-will employment status." *Cf. Smith v. Caterpillar, Inc.*, 304 F. App'x 391, 394–95 (6th Cir. 2008) (applying a similar analysis under Kentucky law). There is simply no evidence that any contract, whether express or implied, existed between Bennink and Cincinnati Bell.

## B. Bennink's Wage Claims Fail Because He Is Subject to the FLSA's Computer Employee Exemption.

The FLSA requires covered employers (and there is no question that Cincinnati Bell is a covered employer) to pay non-exempt employees a set minimum wage. 29 U.S.C. § 206(a). The FLSA further requires employers to pay those employees at least one-and-a-half times their regular pay for overtime hours—that is, for any hours beyond forty per week. *Id.* § 207(a)(1). But those provisions, again, apply only to *non-exempt* employees.

Cincinnati Bell here asserts that Bennink falls within three separate FLSA exemptions—computer employee, administrative employee, and highly compensated employee. (*See* Doc. 19, #1693–1705; Doc. 22, #1855–73). If Cincinnati Bell is correct as to any of the three, Bennink is not entitled to overtime compensation. Here, the Court starts and ends its analysis with the first of the three categories. Because the Court agrees that Bennink is a computer employee, it need not, and thus does not, reach the other two exemptions

But before diving headlong into consideration of the computer employee exemption, the Court begins with some important background principles. First, Cincinnati Bell, as the employer, bears the burden of proving that Bennink is an exempt employee. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). And it must do so by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025). Second, the Court, in "construing" the exemption, must give it a "fair" reading, not a "narrow" one. *Curran v. Wepfer Marine Servs., Inc.*, No. 23-5284, 2024 WL 4489916, at *3 (6th Cir. May 20, 2024) (quoting *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018)). Beyond that, determining whether an exemption applies involves both a question of fact and a question of law. "[H]ow an employee spends his time is a question of fact," but "whether his activities fall within an exemption is a question of law." *Jastremski v. Safeco Ins. Cos.*, 243 F. Supp. 2d 743, 747 (N.D. Ohio 2003).

With those principles in mind, turn to the computer employee exemption. The exemption provides that the FLSA's minimum wage and overtime requirements do

not apply to any employee who (1) "is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker," (2) has a "primary duty" that falls within those enumerated by the statute, and (3) earns a minimum salary of $684 per week or a minimum hourly rate of $27.63. 29 U.S.C. § 213(a)(17); 29 C.F.R. §§ 541.400, .600 (2020). In terms of that second element, the enumerated primary duties that qualify for the exemption include:

(A)  the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(B)  the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(C)  the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

(D)  a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills.

29 U.S.C. § 213(a)(17).

Putting aside the parties' dispute about whether Bennink was an hourly or salaried employee, everyone agrees that Cincinnati Bell paid Bennink at a rate of over $27.63 per hour. (Doc. 22-1, #1882). So the exemption's third requirement poses no obstacle. The parties do, however, dispute the first two elements. Each deserves review.

Start with element one—which asks whether Bennink falls within certain categories of employees (e.g., computer programmer, etc.). The Court concludes that he does. Although Bennink is not a "computer systems analyst," "computer programmer," or "software engineer," the Court finds that he is a similarly skilled

worker. *See* 29 U.S.C. § 213(a)(17). At his deposition, Bennink described IVR call flow design as "very complex" because it entailed "looking at all th[e] [infrastructure's] interaction parts" and ensuring "they're all connected." (Doc. 12, #199). In other words, Bennink had to consider all the data flowing through the IVR and determine what the "information represent[ed]," where "it c[a]me from," and what "it mean[t]" in order to engineer the call flow. (*Id.*). Designing the IVR, according to Bennink, was "about molding around process and procedure." (*Id.* at #202). And to effectively do that, Bennink developed an expertise concerning the rest of the infrastructure beyond just the IVR—that is, he knew about dial plans, switches, and "the various [other] contact center technologies." (*Id.* at #227–32). That indicates similar skill to a computer systems analyst or software engineer. *Ross v. Creative Image Techs., LLC*, No. 3:13-cv-3, 2014 WL 2890467, at *4 (W.D. Ky. June 25, 2014) (finding the plaintiff's testimony "that as a 'design engineer,' he determined *how* the pieces would connect through the use of certain computer software" persuasive in concluding that he was similarly skilled (emphasis in original)). Bennink's activities at Cincinnati Bell, in other words, "pertain[ed] to the highly skilled work of designing or creating computer systems … to meet [a] business's needs." *Edelmann v. Keuka Coll.*, No. 16-cv-6293, 2019 WL 3816563, at *4 (W.D.N.Y. Aug. 14, 2019).

What's more, when it came to migrating infrastructures, Bennink also had intimate knowledge of the various platforms (e.g., on-premises versus cloud-based) and operating models (e.g., whether a given infrastructure or infrastructure components uses numeric or alphanumeric data structures) companies use to support

their contact center infrastructures. (*Id.* at #232, 234–39). He explained how he had to "pull[] those different [models] to service," "understand[] how th[ey] would relate to [infrastructure] designing and building," and "mov[e] them over" to Cincinnati Bell's set-up. (*Id.* at #238). In supporting the migrations he accomplished during his tenure, Bennink necessarily exhibited an "in-depth knowledge of both the software and … operating systems" of the various companies with which he worked. *Mock v. Fed. Home Loan Mortg. Corp.*, No. 1:13-cv-1292, 2014 WL 3545096, at *11 (E.D. Va. July 15, 2014), *aff'd*, 589 F. App'x 127 (4th Cir. 2014).

If that's not enough, Bennink's own descriptions of his role on his resume further confirms that he was "similarly skilled." 29 U.S.C. § 217(a)(17); (*see* Doc. 12-7, #598–99 (describing his role at Cincinnati Bell as requiring him to "[d]esign, implement, and maintain IT solutions and services, such as IVR call flow designs, dial plans, and various end user support applications"); *see also id.* (describing a prior role as an "IT Consultant" who "[e]valuated client's … systems, hardware, software, network, and security infrastructure to identify areas for improvement")). In short, Bennink's testimony and resume demonstrate that he engaged in the duties and developed the expertise necessary to make him a "similarly skilled worker" under the statute. *See Haluska v. Advent Commc'ns, Inc.*, No. 2:13-cv-1104, 2014 WL 5823105, at *7 (W.D. Pa. Nov. 10, 2014).

But the analysis doesn't end there. At the second step, the Court must ask whether Bennink's primary duties fall within those described in the statute. As relevant to the exemption here, the Court, in looking at Bennink's "job as a whole,"

29 C.F.R. § 541.700(a), must determine whether his primary duties involved the "design, development, documentation … testing, or modification of computer systems or programs," which "related to user or system design specifications," 29 U.S.C. § 213(a)(17)(B). Ultimately, they do. But explaining why takes some effort.

To start, the Court notes that it finds that Cincinnati Bell's IVR technology is a "computer system." True, it's a "telephony interface," but it operates on a cloud-based platform and involves servers, applications, and data transmission. (Miller Dep., Doc. 15-1, #1131–32). That's a computer system. Moreover, a significant aspect of Bennink's role at Cincinnati Bell centered on the "design, development, [and] documentation," 29 U.S.C. § 213(a)(17)(B), of the IVR call flows through that computer system, (Doc. 12, #190–92, 239–40). He also designed the dial plans within the larger contact center infrastructure. (*Id.* at #226–27, 239–40). And in doing those things, Bennink employed creative problem-solving and exercised significant discretion, (*id.* at #240–41), to innovate solutions and corresponding documentation that met the end users' needs, *see Grills v. Hewlett-Packard Co.*, 88 F. Supp. 3d 822, 826 (N.D. Ohio 2015).

Bennink likewise managed infrastructure migrations, which involved modifying IVR call flows and integrating platforms. (Doc. 12, #234–36, 239–40). Indeed, he testified that he was "a primary source" on the Hawaiian Telecom migration—a project to which he dedicated significant hours. (*Id.* at #235–36, 265–66). Beyond that, Bennink "play[ed] point" on the Avaya transition, during which time he "work[ed] with them" on the infrastructure "solutions that were being

implemented," like the dial plan, switch, and IVR. (*Id.* at #220–23). So while the parties didn't supply the Court with a detailed breakdown of the hours Bennink dedicated to his various tasks at Cincinnati Bell, the Court finds that they included "design, development, documentation … testing, or modification" of the IVR and related programs, all of which "related to user or system design specifications," 29 U.S.C. § 213(a)(17)(B).

Beyond that, Bennink dubbed himself an "Operations / IT Solutions & Services Engineer." (Doc. 12-7, #598). True, job titles don't carry the day when it comes to whether the FLSA exemption applies. 29 C.F.R. § 541.400(a). But Bennink's deposition testimony confirms that the title aptly describes his role at Cincinnati Bell. So, giving the exemption a "fair" reading, *Curran*, 2024 WL 4489916, at *3 (quotation omitted), the Court concludes that Cincinnati Bell has, by a preponderance of the evidence, demonstrated that Bennink is a computer employee subject to the exemption.

Bennink urges a different conclusion. In doing so, he first argues that he is not a "similarly skilled worker," but a mere project manager. (Doc. 20, #1810–11). For the reasons already noted, though, the Court disagrees. The Court doesn't doubt that Bennink was a project manager for certain Cincinnati Bell projects. (*See, e.g.*, Doc. 12, #206; Neises Dep., Doc. 14-1, #915). But that doesn't supplant the "high level of skill" and "in-depth knowledge" he acquired concerning Cincinnati Bell's contact center infrastructure. *Mock*, 2014 WL 3545096, at *11. And Bennink's attempt to avoid the exemption by highlighting his lack of a college degree or formal computer

training doesn't work either.[2] The exemption imposes no educational requirement, nor does it require "a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge." *Bobadilla v. MDRC*, No. 03 Civ. 9217, 2005 WL 2044938, at *6 n.5 (S.D.N.Y. Aug. 24, 2005) (citation omitted). The exemption focuses on skill, which Bennink had, not formal training, which may have been lacking.

The cases Bennink cites offer him no help either. Take *Verkuilen v. Mediabank, LLC*, for example. (Doc. 25, #1999–2000). There, the plaintiff was merely a liaison between the employer-company's clients and programmers. No. 09 C 3527, 2010 WL 2011713, at *1 (N.D. Ill. May 19, 2010), *aff'd*, 646 F.3d 979 (7th Cir. 2011). Importantly, there was "no evidence that she gained skills" similar to an analyst, programmer, or engineer, so the court there determined that the exemption didn't apply. *Id.* at *5. Not so here. As the Court explained, Bennink was more than a mere liaison between end users and the IT team. For example, he personally designed the IVR call flow, at least at a logical level, and also migrated infrastructures. For that reason, *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44 (D.D.C. 2006), is likewise unpersuasive. Unlike the plaintiff there, Bennink was more than a "technically

---

[2] Bennink also argues that using Visio—what he calls "a basic Microsoft Office application"—to map call flow designs is not a sufficiently sophisticated programming application to alone render him a computer employee. (Doc. 23, #1942). Maybe so, maybe not. Either way, that argument doesn't save his case. Why? Because, as the Court explained, Bennink did more than merely use Visio—he designed "complex" IVR call flows and dial plans, relying on his technical knowledge of the overall IVR system. (Doc. 12, #197–98). Visio is simply how he documented that design. Plus, Bennink wasn't using Visio to map out a simple organizational charts or operational flows; he used Visio to map out fifteen-foot-long, complex diagrams of how data flowed through the IVR system. (*Id.*).

proficient help-desk employee," *id.* at 52, or at least that's what his testimony and resume say. So Bennink's argument on this front fails.

Bennink next says that his primary duties do not fall within those the exemption recognizes.[3] And he makes a couple arguments as to why. First, Bennink complains that Cincinnati Bell failed to highlight any evidence that the IVR call flow system, which Bennink designed, is a computer system or program. (Doc. 25, #2005). And that means Bennink designing the IVR puts him outside the exemption's reach. (*See id.*). But Bennink's testimony forecloses that argument. He described the IVR as an "interactive platform" that required "pulls from databases [and] from various applications." (Doc. 12, #190, 193–94, 197–98; *see* Doc. 15-1, #1131–32). So even if the call flow or dial plans aren't, standing alone, computer systems (and the Court agrees they probably are not), they are nonetheless pieces of a computer system. And Bennink designed those aspects of the system with the larger infrastructure—data flow, data interactions, and data consumption—in mind. (*See, e.g.*, Doc. 12, #198).

Next, Bennink attempts to recast his deposition testimony (and resume) to draw a clean line between himself and the IT team. He claims, for example, that he merely created "workflow chart[s]" and "visual aids," which he then passed along to the IT team. (Doc. 25, #2005). And "it was up to [that] department to figure out" how to manipulate the underlying contact center infrastructure to implement those charts

---

[3] Bennink also complains that Cincinnati Bell has not established which of his duties were the "primary" ones. (Doc. 25, #2003–04). He's right that Cincinnati Bell did not specifically delineate how many hours or what percentage of time Bennink dedicated to his various tasks. But, having reviewed Bennink's deposition testimony, the Court is satisfied that when considering Bennink's "job as a whole," 29 C.F.R. § 541.700(a), his primary duties entailed exempt work—especially in light of the hours he spent on the Hawaiian Telecom migration.

23

and aids. (Doc. 23, #1942–43). Bennink further highlights that he lacked access to the computer systems that Cincinnati Bell's IT team used to code infrastructure changes. (*Id.* at #1942, 1948 n.5). As for his responsibility to test the call center infrastructure, Bennink says he merely conducted "user acceptance testing," which did not involve testing computer systems or applications. (*Id.* at #1943 (quotation omitted)). In short, he confines his role to the "operational," disclaiming any cross-over into the IT realm. (*Id.* at #1949).

But Bennink's effort to distance himself from the computer exemption falls short. For starters, the exemption is not limited only to coders, *Young v. Cerner Corp.*, No. 6-0321-cv, 2007 WL 2463205, at *4 (W.D. Mo. Aug. 28, 2007), as Bennink seems to suggest. So even if the division of labor (according to the RACI chart, for example) allocated certain programming-related tasks to the IT team, that doesn't necessarily place Bennink outside the exemption's purview. Nor does Bennink's inability to access the computer programs underlying the infrastructure foreclose his inclusion in this exemption. For the reasons already explained, Bennink's primary duties involved "designing" and "documenting" aspects of the IVR system, and when it came to migrations, modifying that system. Admittedly, his modifications to the system occurred more at the logical and design-flow level than at that physical implementation level. But those duties still bring him within the exemption.

Finally, Bennink takes a pragmatic tack, arguing that if the Court finds him a computer employee, then "nearly every employee in every occupation" could be one. (Doc. 23, #1944; *see* Doc. 20, #1816). The Court, however, is not convinced. It's one

thing to say that an Amazon marketing employee who instructs a web developer on the desired aesthetics of a web page is not a computer employee. (Doc. 25, #2009). It's quite another to say the same of an operations/IT solutions and services engineer who designs "very complex" IVR data flows, (Doc. 12, #198), and describes some of his core competencies as "telephony designs [and] development," "technical writing," and "infrastructure maintenance," (Doc. 12-7, #598). In other words, while some individuals who partner with IT employees to complete interdisciplinary tasks may not qualify as a computer employee, Bennink does.

## CONCLUSION

For these reasons, the Court **GRANTS** Cincinnati Bell's Motion for Summary Judgment (Doc. 19), and thus **DENIES** Bennink's Motion for Summary Judgment (Doc. 20). The Court further **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket.

**SO ORDERED.**

February 4, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

25